# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TIFFANY WILLIAMS**, | * | |
| Plaintiff | * | |
| v. | * | Civil No. **PJM 16-4115** |
| **UNITED STATES OF AMERICA, et al.** | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

Tiffany Williams has sued United States Marshals John Lopez and Linwood "Chuck" Battle for unlawful search and seizure. She sues Grady Management, Inc. ("GMI") for unlawful entry, unwarranted invasion of privacy and breach of contract.

The suit arises out of a warrantless search of Williams' apartment residence, located in the Fox Hills apartment complex at 1140 Kennebec Street, Unit 204, Oxon Hill, Maryland (the "Unit"). On September 12, 2014, Lopez, Battle and other law enforcement officers, all members of the Capital Area Regional Fugitive Task Force ("CARFTF"), were in pursuit of a fugitive—Leonard Delonte Short—which led them to the Fox Hills apartments, managed by GMI. When the CARFTF officers arrived, Lopez first met with GMI representative Andrea Brown and informed her that he believed the fugitive they were seeking was residing in Williams' apartment. Based on that information, Brown gave Lopez a key to the Williams apartment, where CARFTF officers conducted a search but did not discover the fugitive. Later that day, Short was in fact found inside the apartment next door to Williams' apartment and arrested.

Battle, Lopez and GMI have moved to dismiss Williams' claims for failure to state a claim, or, in the alternative, for summary judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

These are the undisputed facts.

On July 28, 2014, Leonard Delonte Short ("Short") committed an armed bank robbery in Wilmington, North Carolina. ECF No. 25-1 at 4. A North Carolina State warrant for him was issued, and the U.S. Marshal Service ("USMS") began an interstate manhunt for him. *Id.* On August 29, 2014, a Deputy U.S. Marshal in the Eastern District of North Carolina asked CARFTF to assist in the search for Short.

On the basis of confidential information, the USMS discovered that Short was likely residing the Washington, D.C. Metropolitan area. *Id.* Investigation further revealed that a co-conspirator in the bank robbery, Short's possible girlfriend Porsha Davis, had transported Short from North Carolina to the Washington, D.C. Metropolitan area, that Davis was in fact residing in the D.C. area, and that Short had associations in the area, including with an individual known as Lavonne "Lovie" Graves, as well as several of Short's family members. *Id.* It was also discovered that Short had previously been arrested in Suitland, Maryland. *Id.* Finally, the USMS obtained electronic surveillance orders for two cell phones, one believed to belong to Short [telephone number (202) 910-9423] and one believed to belong to Graves [telephone number (202) 413-8457] (together, the "target phones"). *Id.* at 4, 5.

On September 10, 2014, after conducting surveillance on her residence, the USMS arrested and interviewed Porsha Davis. *Id.* at 5. Davis told the officers that she believed "Lovie" Graves to be Short's wife and that Graves lived at the Fox Hills apartment complex, although Davis did not identify the particular apartment in the complex in which Short might be. *Id.* Davis further provided descriptions of two vehicles known to be driven by Short and Graves, viz., a blue Chevy Pacifica with D.C. tags that Davis had observed Short driving on September 7, 2014,

and a red Toyota Camry with temporary tags believed to be owned by Graves. *Id*.

Based on the information provided by Davis, on September 10, 2014, CARFTF officers went to the Fox Hills complex and arranged for visual surveillance of Short and Graves. *Id.* at 5. Shortly thereafter, the officers in fact observed the blue Chevy Pacifica with D.C. tags associated with Short in the parking lot, and watched as three people exited the apartment complex and drove away in the vehicle. *Id.* None of the individuals observed, however, matched the physical description of Short. *Id.* After approximately four hours, having failed to see Short or Graves, the officers discontinued surveillance. *Id.*

Two days later, on September 12, 2014, Lopez, Battle and other CARFTF officers again undertook visual surveillance at the Fox Hills apartment complex. This time they did observe Short—the fugitive in question—who, along with an unidentified woman, walked into the apartment complex. *Id.* 5-6. Since the stairwell leading to the second floor of the apartment complex was visible from the exterior, the officers were able to observe Short and the unidentified woman walk up the stairwell to the second floor and into an area of the building containing Units 203 and 204 (Plaintiff Williams' apartment). *Id.* at 6. After seeing Short, Lopez went to GMI's on-site office and spoke with GMI's on-site property manager, Andrea Brown, while Battle and other CARFTF officers waited in their vehicles. *Id.* Lopez inquired of Brown whether Short or Graves lived in the complex, but Brown replied that neither individual was listed on a lease. *Id.* Brown then provided Lopez with the names on the leases for Units 203 and 204. *Id*. Unit 203 was leased to an unknown male; Unit 204, on the other hand, was leased to Plaintiff Williams. *Id.*

Lopez relayed the names of the leaseholders for Units 203 and 204 to Senior Inspector Ed Cline ("Cline"), a member of the USMS's Technical Operations Group ("TOG"), who was at the

complex conducting electronic surveillance of the target phones from his vehicle. *Id.* Cline ran the names of the two leaseholders through the call records of the target phones and found that Plaintiff Williams in Unit 204 had in fact placed a phone call to Graves' phone number on the morning of July 11, 2014.[1] ECF No. 29-1 at 12. Cline relayed this information to Lopez, who concluded that Short was very likely residing in Unit 204. ECF No. 25-1 at 7. When Lopez informed Brown of this determination, Brown provided Lopez with a key to that Unit.[2] *Id.* At no point did Lopez, Battle or any of the other CARFTF officers obtain or provide a search warrant for the Unit.

Lopez then informed the other CARFTF officers of his determination that Short was likely residing in Unit 204. *Id.* The officers proceeded to the second floor of the complex, knocking on Williams' door, but received no response. *Id.* at 8. They knocked again and announced their presence, but again received no response. *Id.* Using the key provided by Brown, the officers then entered Unit 204 and conducted a search for Short, but found no one inside. *Id.* During the search, the officers noticed a photograph of Williams wearing a Washington, D.C. Metropolitan Police Department ("MPD") uniform whereupon members of the CARFTF, who were also MPD officers, telephoned MPD and confirmed that Williams was indeed an officer in the MPD's Sixth District. *Id.* Battle and several other CARFTF officers immediately went to the MPD's Sixth District Station, where they located and interviewed Williams regarding Short and

---

[1] Williams disputes the Government's characterization of this call. The Government does stretch the facts by saying that Williams had been "in recent contact with one of the target phones for Short" when the phone call had actually occurred two months prior. Nonetheless, Williams does not dispute that she did have prior phone contact with Graves, and it is this contact that suggests the reasonableness of the officers' overall belief regarding Short's whereabouts.

[2] Williams alleges that Lopez falsely claimed Short was Williams' "cousin" when telling Brown his belief regarding Short's whereabouts. First Amended Complaint at ¶ 19, ECF No. 22. Even though the Government disputes this fact, whether Lopez referred to Short as Williams' cousin is immaterial to determination of the present Motions.

his whereabouts. *Id.* During the interview, the officers showed Williams a picture of Short, and she informed them that she had in fact seen him with her neighbor. ECF No. 25-1 at 9; ECF No. 29 at 1-2.

Immediately following the interview, the officers who met with Williams relayed the information she provided to the CARFTF members who had remained at Fox Hills. ECF No. 25-1 at 9. Those officers proceeded to Unit 203, found Short inside, and arrested him without incident. *Id.* at 9.

On December 28, 2016, Williams filed a complaint in this Court against GMI, Battle and the United States, alleging unlawful search and seizure under 42 U.S.C. § 1983 against Battle, unlawful entry against all defendants, unwarranted invasion of privacy against all defendants, and breach of contract and negligence against GMI. On February 21, 2017, GMI moved to dismiss the Complaint for failure to state a claim. On March 7, 2017, Williams filed a Response in Opposition, and GMI filed a Reply. On July 11, 2017, Williams filed an Amended Complaint that removed the United States as Defendant and added John Lopez. She also amended her claims, alleging unlawful search and seizure against Battle and Lopez, and unlawful entry, breach of contract and unwarranted invasion of privacy against GMI. On July 19, 2017, GMI renewed its Motion to Dismiss, incorporating its earlier briefs by reference. On July 20, the Government filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, on behalf of Battle and Lopez.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) governs dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts,

the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and quotation marks omitted). "[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court will also "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor . . . ." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). But "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts . . . ." *Nemet Chevrolet*, 591 F.3d at 255. "[A] complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)) (quotation marks omitted). "Facial plausibility is established once the factual content of a complaint 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 256 (quoting *Iqbal*, 129 S. Ct. at 1949). "[T]he complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1952).

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean, however, that "*some* alleged factual dispute between the parties" defeats the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

### III. ANALYSIS

### A. Battle and Lopez's Motion to Dismiss

#### 1. *The Doctrine of Qualified Immunity*

Battle and Lopez argue that the First Amended Complaint should be dismissed for failure to state a claim because Williams has not alleged facts sufficient to overcome their qualified immunity. This doctrine shields government officials from personal liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is intended to give officers the necessary latitude to exercise their authority by ensuring that only conduct that unquestionably violates the Constitution will subject an official to personal liability for damages. *See, e.g., Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'").

In deciding whether a law enforcement officer is entitled to qualified immunity, courts consider whether the facts alleged, viewed in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right and whether the constitutional right at issue was "clearly established" at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236. If the answer at either step of the inquiry is no, qualified immunity attaches and judgment must be entered for the defendant.

#### 2. *Whether the Officers Violated a Constitutional Right*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

"At the very core" of this guarantee "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Ct., 407 U.S. 297, 313 (1972). Thus, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).

Even so, this presumption can be overcome. "[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Battle and Lopez argue that three such exceptions existed at the time of their warrantless search: first, that they reasonably believed that Short lived in Unit 204 and was home at the time of the search; second, that exigent circumstances existed that justified the warrantless search; and third, that the officers could have reasonably believed that Brown had provided valid consent to the search.

### a. Search of a Residence Pursuant to an Arrest Warrant

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). "Generally, circuits have broken the analysis of whether the entry was lawful into two conjunctive parts: (1) whether there is reason to believe that the location is the defendant's residence, and (2) whether or not there was a 'reasonable belief' that he would be home." *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011).

The circuit courts disagree as to whether *Payton*'s "reason to believe" standard is the same as probable cause, and the Fourth Circuit has declined to explicitly rule on the issue. *See, e.g.*, *United States v. Exum*, 657 Fed.Appx. 153, 155 (4th Cir. 2016) ("As noted by the parties, courts disagree as to whether Payton's 'reason to believe' standard requires a showing of probable cause or something less, and we have not resolved the issue."); *Hill*, 649 F.3d at 263 ("[W]e decline to reach a conclusion as to whether 'reason to believe' is as stringent as 'probable cause' . . . ."). However, even if the "reason to believe" standard is as stringent as the probable cause standard, the Court finds that the standard has been met here.

To properly assess whether probable cause existed, Courts consider the "totality of the circumstances," which means courts "assess whether officers had probable cause by examining all of the facts known to officers leading up to the arrest, and then asking 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,' amount to probable cause." *United States v. White*, 549 F.3d 946, 950 (4th Cir. 2008).

Based on the facts known by Battle and Lopez at the time of the search, the Court finds that they and the CARFTF officers had probable cause, and thus sufficient reason to believe, that Short was not only living in Unit 204, but that he was physically occupying that Unit when they conducted the search. The officers correctly determined that Short was residing, at least temporarily, at the Fox Hills apartment complex based on reliable information from Porsha Davis and their own visual observations of him in the complex. Moreover, the officers had ample reason to believe that Short resided in Williams' particular apartment, Unit 204, based on the fact that Williams was the only person identified by GMI as a known resident who also appeared among the call records of one of the target phones. Even though Williams' phone contact had been with Lavonne "Lovie" Graves, the officers had earlier been given to understand from Davis

that Short was married to and living with Graves. Since Brown told the officers that no one by the name of Graves was a named lessor of any unit at the complex, the officers could have reasonably concluded that Short resided at, and was physically within, Williams' apartment at the time of the search.

Williams alleges no facts that materially contradict those put forth by Government. Her First Amended Complaint merely states that "[a]t no time did defendants Battle or Lopez have any evidence that the person that they were seeking had ever been in plaintiff's residence; had communicated with the plaintiff, or even knew the plaintiff." First Amended Complaint at ¶ 9, ECF No. 22. These allegations are simply irrelevant to whether other facts gave the officers probable cause to believe that the fugitive Short was located in Williams' apartment. In short, qualified immunity clearly obtains here.

Because the Court finds that Lopez, Battle and the other CARFTF officers entertained a reasonable belief that Short, who was subject to a valid arrest warrant, was residing in Unit 204 and present there at the time of the search, the September 12, 2014 warrantless search did not violate the Fourth Amendment. Battle and Lopez' Motion to Dismiss will be granted.

      b. Exigent Circumstances and Valid Consent

The Government also argues that the warrantless search of Williams' apartment did not violate a constitutional right because the search was justified by exigent circumstances, specifically "hot pursuit," officer safety, public safety, and risk of flight. It also argues that it was reasonable for officers to believe that Brown provided valid consent to their search. Compelling as the Government's arguments may be, because the Court finds no violation of a constitutional right, it is unnecessary to consider them.

      *3. Whether the Constitutional Right at Issue was "Clearly Established" at the Time of the Alleged Violation*

There can be no doubt that the Defendants acted constitutionally in this case, so there is no occasion to decide whether Williams' rights were "clearly established" at the time of the alleged violation. *Pearson*, 555 U.S.at 232.

**B. GMI'S Motion to Dismiss**

GMI has moved to dismiss the three causes of action against it (unlawful entry, breach of contract, and unwarranted invasion of privacy) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

In order to survive a 12(b)(6) motion, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)) (quotation marks omitted). The Court finds Williams has not met this burden with respect to GMI.

All of Williams' claims against GMI arise out of her rental contract with GMI and thus sound in either contract or tort. The Court applies Maryland common law in considering whether Williams has stated a claim. Under Maryland law, a lease agreement, as with any other contract, is interpreted pursuant to the law of objective contract interpretation. A court need not consider any parol evidence where the meaning of the contract is clear and unambiguous. *Garcia v. Foulger Pratt Dev., Inc.,* 155 Md. App. 634, 656 (2003).

Williams' lease provides that "nothing in this paragraph [regarding access by the landlord] shall prevent the Landlord from entering any leased premises in an emergency situation . . . ." Exhibit A at ¶ 23, Motion to Dismiss, ECF No. 4-2. A plain reading of this provision makes clear that GMI was entitled to enter the leased premises in an emergency situation. The pursuit of a possibly armed fugitive by law enforcement clearly qualified as such a situation.

Nonetheless, Williams argues that Brown was not entitled to rely on this lease provision

because the information Battle and Lopez provided Brown was purportedly false and the Marshals provided "no evidence that the person that the police w[ere] seeking had never [sic] been observed in plaintiff's residence nor had ever been in her presence." First Amended Complaint at ¶¶ 9, 11, ECF No. 22. This statement is entirely beside the point. The Marshals were in possession of multiple facts establishing the probability of Short's presence in Williams' apartment. Not only is there zero evidence that the Marshals lied to Brown, there isn't the least evidence suggesting Brown had any basis to suppose they were lying. Brown was entitled to rely on the Marshals' statements regarding where Short appeared to be living, and to assume that the CARFTF officers were acting properly under color of their legal authority. Indeed, Brown was hardly in a position to question the Marshals as to the veracity of the basis for their beliefs. Under the circumstances, such questioning would have not only been unreasonable; it may well have subjected Brown to a charge of obstruction of justice.

Because Williams' lease with GMI provided that GMI could enter her apartment in an emergency situation, clearly the case here, and because the Marshals in no sense have been shown to have "lied" to Brown or that she had any reason to believe that they might be lying, GMI's Motion to Dismiss is **GRANTED**.

## IV. Conclusion

Lopez and Battle's Motion to Dismiss, ECF No. 25, is **GRANTED**, and GMI's Motion to Dismiss, ECF No. 23, is **GRANTED**.[3]

A separate Order will **ISSUE**.

/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**December 20, 2017**

---

[3] Defendants' alternative Motions for Summary Judgment of both Defendants are **MOOT**.